Good morning, judges. May it please the court, my name is Vicki Dobrin and I represent the petitioner Mr. Abdi. I'd like to reserve three minutes for rebuttal. As the court can probably tell, this case turns almost entirely on credibility. Not only Mr. Abdi's credibility, but the credibility of the government witnesses. And we believe that the totality of the circumstances test, which the agency applied to Mr. Abdi's testimony, should also apply to the witnesses that the government presented. Now, the board acknowledged that that standard applied, and in his brief, respondent also seems to acknowledge it applies. But reviewing the record, it's clear that the agency did not apply that test at all to the government's witnesses. In finding Mr. Abdi not credible, the immigration judge relied on trivial or non-existent inconsistencies, which we've addressed extensively in our briefs. But there were a lot of inconsistencies that he pointed out, but there were a couple of them that were pretty substantial, such as the difference between the declaration and his testimony as to his uncle's death. Can you address that specifically? Sure. I mean, at the outset, the agency did not rely on that to find him not credible, and so we believe that under Chenery, that issue or that factor is not before the court. We didn't even address it to the BIA because it wasn't a reason that the IJ gave to find him not credible. But even assuming that it were something that the court could consider, he credibly and reasonably explained away that alleged inconsistency. And, you know, as far as all of the other reasons. But he attributed it to an interpretation error, was that correct? He said that, but it sort of depends on whether it was an error. Because, you know, the issue was whether his uncle was targeted or whether it was a random killing. And, you know, it wasn't entirely clear. But he didn't rely on that in support of his asylum claim. That wasn't what his asylum claim was based on. And so it doesn't really go to the merits of this application for relief. And so we don't believe it's all that relevant. What about the persecutor bar? So I'd like to definitely get to that. So with regard, the finding was based entirely on the testimony of the government witnesses. And turning to their testimony. A mother and a daughter who described how the petitioner directed police forces that pretty clearly tortured them, right? Well, that was their testimony. But we believe that. I.J. heard the testimony and made specific findings as to their credibility. Your client was given a full opportunity to cross-examine, correct? He was. And we believe that through that cross-examination and through his impeachment evidence, serious questions were raised as to the credibility of those witnesses. And I'd like to just highlight the most compelling reasons why those witnesses, under a substantial evidence standard, are not credible. First, they testified inconsistently with Agent Morneau, the government's designated representative. She prepared a detailed memorandum. She testified regarding it as to its reliability. And so when the witnesses testified inconsistently with it, that should have been a significant factor that the I.J. considered in assessing their credibility. Next, Mr. Oddie presented definitive documentary evidence that he was not the police commissioner at the time they alleged he persecuted them in that capacity. The agency did not even consider those letters. These are official, original documents that he had on his person before he even entered the United States. Did he deny being present when the mother and daughter claimed they were tortured? Absolutely. He denies it. He denies that he was there. The I.J. listened to the testimony and chose to believe these two witnesses and listed specific evidence that supported their credibility. Don't we give some deference to the I.J.'s determination? As long as she applies the appropriate test and as long as this court is confident that she considered all relevant factors. Looking at her decision, she relied almost entirely on demeanor. And demeanor cannot be a substitute for clear examples of inconsistent testimony for all of the rebuttal evidence that we presented that impugned their credibility. So, yes, certainly demeanor is entitled to deference, but we believe that the immigration judge in this case manipulated the demeanor to find those witnesses credible and failed to consider all of the instances in which we established that they weren't. What does his title for occupation as commander, I think that's the term you used. Commissioner. Commissioner, excuse me. Have to do with whether he was present at the scene directing police forces to arrest and subsequently torture these two. Well, because the witnesses testified in great detail that he was. He was either there or he wasn't there, whether he was the commissioner or just in charge of this particular group of officers, correct? That's true. But they also testified to interactions they had with him, allegedly had with him at his office. And he testified and the letters he submitted reflected that he was not allowed to go to his office. All of his police property had been taken. Everything was handed over to another, to his second in charge. So he wasn't in an office, a police office, during the entire month of July. And beyond that, the witnesses testified inconsistently as to whether he even came to their house at all. Was he a member of the ONLF? No, he was not. And so as to whether he even came to their house, this is a significant inconsistency because Agent Morneau testified and the IJ found her credible. She testified that the witnesses did not tell her that he came to their house that night. They indicated to her that he did not come on the scene until later at the police facility. In contrast, when they testified in court, they testified, you know, they embellished and they talked about him being at their house and they went on and on about the things that he did that evening. And certainly had that been true, they would have told the lead investigator during a three-hour interview that she had with them only weeks before the interview. And we identified in our briefs a number of areas in which the witnesses were inconsistent, not only internally but with each other on material points. For instance, one testified that Mr. Abdi that evening had a pistol and she was very clear about that. The other testified, no, he had a black baton that bends and she drew a picture of it. One testified that he was wearing a blue police uniform. The other said, was asked specifically by the judge, was he wearing a uniform? No, he was in plain clothes, a shirt and pants and they were spotted. One testified that Ms. Neuer and her other daughter were taken away in a beige pickup truck. The other testified they were taken away in a black or a dark brown Land Cruiser. They testified inconsistently about Ms. Neuer's alleged second arrest with each other and with what they told Agent Morneau. They testified inconsistently as to whether they had any family in Ethiopia. And we could go on and on. Right. And the difficulty is, from our perspective, is we're sitting here as an appellate court after the BIA has already assessed this as well. And while we might, even if we agreed with you, we still owe the factual findings some deference. So what do you think the legal error is in the way that the IJ approached the credibility of these witnesses? We believe she focused almost exclusively, she cherry-picked. She relied on the demeanor and excluded or failed to analyze any of the other significant and compelling reasons why the witnesses weren't credible. And at the very least, the court should remand these proceedings to the agency so that it fully consider or even initially consider all of the different reasons that we've argued that these witnesses were not credible. You know, and I could continue. They were also not. You know, I understand. And you've, of course, contained your briefs as well. But it's, you know, there are problems with the testimony, no doubt about it. But the fact finder is entitled to resolve those differences. And a lot of times we look at a transcript, whether it's a district court transcript or an IJ transcript, and say, I don't think I would have gone that way. But it's not our place to second-guess unless we find some legal error, analytical error in the way that the IJ approached it. Right. I mean, but this court routinely reverses. So cherry-picking probably doesn't get you there. Well, I mean, this court has the authority to determine whether substantial evidence supports the finding. And it routinely reverses negative credibility findings. So this court certainly has the authority to reverse a positive credibility finding. It's, you know, the opposite situation. The tables are turned here. But, you know, in analyzing. It's a bit unusual. I mean, this case is an unusual case in many respects. But do you have a case where we've actually said, all right, we're reversing a positive credibility finding? I have not been able to find it. I think I'm not surprised because it's an unusual case. And you're correct, Your Honor. And I believe that, you know, for the integrity of this process, these witnesses, it's undisputed that those witnesses, their testimony, are the sole basis for the finding that Mr. Abdi is barred from relief, from removal. And so, you know, to determine whether, you know, substantial evidence supports that, the court needs to ensure that the credibility of those witnesses was properly assessed. And we don't believe it was. And, you know, another reason why or another factor that the immigration judge and the agency did not consider was the plausibility of their testimony. We presented an expert who disputed the plausibility of kind of the crux of what they were saying. They testified that Mr. Abdi, as a police commissioner, which is a political appointment, you know, he's an administrator. He didn't carry a weapon. He didn't wear a uniform. But that he, you know, directed the military that evening and later in the handling of Ms. Neuer and her family members. And Professor Samatar said that's not how these things work. In an operation involving high-security targets such as the ONLF, if the military is present, they are directing the activities, and the regional authorities are adjuncts. And he also, you know, disputed the plausibility that an 8-year-old child would be arrested and then brutally beaten in custody. And, you know, these are just different factors. And finally, the witnesses repeatedly denied any connection whatsoever to the ONLF. And we presented very detailed, credible testimony from a high-ranking member of the ONLF, Mr. Goss, who testified extensively regarding Ms. Neuer. He knew her personally. He fundraised with her in Ethiopia. He was friends with her husband. He went to college with her son. And, you know, the immigration judge gave his testimony no weight at all. And she didn't go through any analysis as to why he wasn't credible, but the government witnesses were. And so, you know, this is a point that should have been resolved. Beyond that, we corroborated his testimony with documentary evidence and video evidence, which depicted the witnesses at an ONLF anniversary celebration in Toronto only weeks before the proceedings closed. And those witnesses conceded that they were there. And, you know, the evidence we presented would definitely indicate that people that were there were members of the ONLF. And so we believe that any one of these factors would support a negative credibility finding under the totality of the circumstances test. But looking at them all together, no reasonable fact finder would find that these witnesses were credible. If the tables were turned, if they were applicants for asylum, I mean, I can't think of really any immigration judge who would have found them credible based on this record. You're down below three minutes. Okay, I'll reserve the rest. That's very good. Thank you, Counsel. When you're my height, this kind of a podium is quite a luxury. Good morning. May it please the Court. My name is Paul Stone, and I represent the respondent, the Attorney General of the United States of America. After a full and fair hearing of 12 days, the immigration judge issued a detailed decision of 120 pages and found Abdi lacked credibility and denied him asylum, withholding removal, and cat protection. She also determined that he was barred by the persecutor of others bar from obtaining asylum and withholding. The immigration judge identified a number of inconsistencies in Abdi's testimony and evidence in determining that he lacked credibility. Many of these inconsistencies came about because he, on one hand, tried to undermine Ms. Mirren and her daughter's testimony, claiming that he had persecuted them, and on the other, trying to show that he was eligible for asylum. Now, I know there was some concern about, I mean, there was a great deal of discussion about inconsistencies in their testimony. The immigration judge discussed them in her statement of facts. The board considered the arguments Abdi's raising now and determined that while there may have been some inconsistencies, they weren't sufficient to overturn the immigration judge's finding. For example— I mean, they put on a pretty extensive case. You handle these cases rarely. If you have a 12-day hearing, you'd agree with that. It's a fairly extraordinary case, Your Honor. The director of oil was involved in the moot, and he was quite impressed. He's been at it for 40 years now, I think. We rarely see a case where you have witnesses who are confronting the testimony of other witnesses. I mean, they did put on a pretty strong case. Certainly in the immigration context, Your Honor. And I did look for published cases on the REAL-ID Act where there are conflicted witnesses like that, and there really aren't. So what do you think that—I mean, it seems to me an open question. How do we assess substantial evidence in a credibility determination when we're dealing with affirmative credibility rather than negative credibility? Well, Your Honor, I believe it would be the similar question, it would just be turned on its head. The question would be whether the evidence compels the conclusion that these witnesses were not credible. And in this case, the evidence would also need to compel the conclusion that Mr. Abdi was not credible, because even if they weren't credible, his testimony needs to be in order for him to obtain relief or protection from removal. And here the immigration judge analyzed the testimony of both parties, all the evidence presented. She went over it in painstaking detail. I've never seen a decision this long, and ultimately weighed them and determined that Ms. Noor and Ms. Mohammed were more credible. The immigration judge was there. She heard the testimony. She saw it. She saw the dignity with which the witnesses purported themselves. And she noted the emotion that Ms. Noor and her daughter underwent when they were recounting their harrowing tale of persecution. They put extraordinary detail into their testimony. Another thing that's unique about this case is you almost never see an asylum applicant giving the kind of detail Ms. Noor and Ms. Mohammed gave into their experiences. Ms. Mohammed, when she talked about Mr. Abdi's office, she discussed where the desk was, where the chair was, details you just don't normally get, details that people usually don't give unless they are confident in what they're saying and what is true. Now, Mr. Abdi has talked a lot about how their testimony conflicts with Agent Morneau's report. As the immigration judge noted, they never saw the report. The report isn't in question-and-answer format. Agent Morneau testified that she said that she believed the report had in it what they told her, but then she later conceded that not necessarily everything was in that. And, in fact, from the face of the report, you can see that she didn't include everything in it. One of the discrepancies Abdi identifies is he claims that they failed to tell her that he was present at their arrest. He considers this to be pretty significant. But if you look at the report on page 2836, Agent Morneau doesn't note that he was there, but in the very next paragraph she notes that Nur and Muhammad's older sister were put in the police commissioner's car. Now, unless the police commissioner is running a taxi service, that means that they, as Ms. Nur testified, had told her that he was there. It just was something that didn't make it into the report. As Agent Morneau said, not necessarily everything did. Now, there was also a number of inconsistencies that the immigration judge pointed out and the board affirmed for Mr. Abdi. For example, Mr. Abdi claims he fears persecution because while he was police commissioner, he refused to order the arrest of suspected ONLF members. Yet he testified, likely to undermine Nur and Muhammad's testimony, that he lacked the power to arrest orders officers to arrest people. Now, looking at his testimony, he testified clearly that he was not involved in arresting individuals. He was not involved in decisions to arrest people. And then he also pointed out that his successor, unlike him, was a uniformed police officer. He didn't have the authority to arrest people, but he did have the authority to order the arrest of people. Finally, he was actually asked about this inconsistency. The DHS attorney asked him why Gabriel, this was the person that allegedly had tried to get him to improperly arrest ONLF suspects, the DHS attorney asked why Gabriel would ask him to have people arrested when he didn't have that power. That was at page 1786. His answers were equivocal and nonresponsive, and then finally he seemed to settle on that Gabriel had just made a mistake. The immigration judge isn't required to accept that explanation, especially given that it would seem odd that someone would be framed and essentially be given the death sentence because of a mistake about his authority. Mr. Abdi also claimed that he was responsible for addressing police misconduct. His jobs were just ministerial, police misconduct, taking charge of new recruits, things like that. But although he was in charge of police misconduct for the entire Ogaden region, which is the equivalent of a state in Ethiopia, he was unaware of any police officers in his region harming suspects. Now, the immigration judge found this incredible. Abdi disputes that this is an incredible point-of-the-country condition evidence, showing that although the evidence shows widespread torture by the police, widespread impunity by the police, it doesn't specify the Ogaden region, and it doesn't specify the years where he was in power. Right, but that conclusion does require a bit of speculation on the part of the IJ because it's not based on hard evidence, it's based on inference, right? Well, yes, and that's part of the immigration judge's job as a finder of fact. The immigration judge has this evidence of impunity throughout Somalia. None of the evidence says that something miraculous happened two years ago and Ethiopia went from being an extraordinarily peaceful state with a highly professional police force to a complete collapse. There's no evidence of that, and there's no evidence that the Ogaden region was a panacea within the state of Ethiopia where the police were more professional than policing in our country. You would be hard-pressed to find a police chief in any major city in the United States who would make the same statement he made. The reality is even the most highly policed force, highly dedicated and professional police force, sometimes abuses happen. So even in the absence of country-conditioned evidence, frankly, it's implausible, and the immigration judge could have made that inference. Here there is, in fact, some evidence that the immigration judge could draw the inference from, draw the conclusion from. Now, Abdi also claims that the federal authorities, whom he fears, work to the regional police to obtain a warrant to arrest him, and this is inconsistent with his claim that the police don't corroborate with the military in pursuing ONLF members. Nur and Mohammed had both testified that people in the military in police uniforms had invaded their home. He was hoping to undermine the plausibility of this claim to say that, look, the police and the military don't work together, they wouldn't show up at their house together and drag them off. Were the witnesses his mother and a daughter? That's correct, Your Honor. Were they members of the ONLF? No, Your Honor, they weren't. They were ethnic Somalis from Somalia living in the Ogaden region, which is a Somali region within Ethiopia, so ethnically they're similar to the people there. But as Ms. Nur continually pointed out, she viewed the ONLF as being specific to the Ogaden clan, and she isn't in that clan. Now, Mr. Abdi attempted to make the case that they were, in fact, members of the ONLF, and the immigration judge considered the evidence and the testimony from these other witnesses and found that Ms. Nur and her daughter's testimony was more credible. Did she make a finding about ONLF membership, the IJ? Yes, I believe she found that they were not members of the ONLF, or at least she did by inference by saying that she wasn't persuaded by the evidence that they were members of the ONLF. What about this video that was brought in? Was there evidence in the record that that, in fact, was an ONLF event? There was some evidence. There was a number of problems with the video. For example, the video had been edited. The translation wasn't certified. It appeared that the event was sponsored by the ONLF, but the immigration judge, who Mr. Abdi thinks was biased against him, ruled in Mr. Abdi's favor and kept out additional evidence by the government because, at that point, it had been going on for so long, but the government had offered evidence that, essentially, this was an ethnic gathering of ethnic Somalis who had lived in the Ugandan region, and Ms. Nur and her family had lived there. And so she was going as someone from that region. But if true, it was pretty probative. It could be, but there was nobody to testify that it was. Well, assuming you get past the authentication problems, there are indications in the record that this was an event sponsored by the ONLF, and as counsel pointed out, there was a concession that they were present. Or was there a concession that they were present?  Had the evidence been left in, there would be, but there would also be a more thorough explanation. But the fact remains that, for example, if you went to a Knights of Columbus gathering, sponsor a Columbus Day celebration, that doesn't mean you're a member of the Knights of Columbus necessarily. No, but it certainly is probative. It is, and Your Honor, it could be probative. And that gives me some concern that at least there was some effort to develop the record on that point because, after all, it's YouTube, so you can just view it. You don't have to view it. That's right. Your concerns about editing can pretty much go away. And anyone can post anything to YouTube as well, Your Honor. Well, true, but it was a film, and the question is, what did it mean? Right. And, Your Honor, ultimately, under the Real Entity Act… Nobody disputes that an event happened. Right, that's correct. Nobody disputes that they were there. The only question is, what's the significance of it, right? It sounded like a good party, but there was no testimony on establishing the significance of it that only members went to this, for example. If you use the example or the hypothetical of the Knights of Columbus, this may be more like going to a Klan rally. Well, that's assuming… Well, you'll concede there's a difference. Well, Your Honor, I'm not necessarily… But Mr. Abdi has also put in a great deal of evidence arguing that ONLF is split into two factions, one of which is very peaceful and one of which is not. And they didn't say which one this necessarily was. But to be sure… But on the question of membership, they try to put in a video, and there's an objection. And the government may well have rebuttaled, but it was probably evidence that didn't come in one way or the other. Right. Well, the government's evidence didn't. And the fact is, you're correct, Your Honor, under the Real Entity Act, the immigration judge could take this into account and make an adverse credibility finding. The question is whether the immigration judge is compelled to make an adverse credibility finding based on this and other things. And the immigration judge just simply isn't. Going to a celebration sponsored by the ONLF doesn't necessarily mean you're a member of the ONLF. We don't know what the celebration meant to them, what it means to go there, who it was open to, who was told about it. It may have just simply been a cultural celebration for people who lived in the Ogaden of Ethiopia. It would, frankly, be speculation to say outright that if you go to this, you're a member of the ONLF and admit to no other possibility otherwise. This is why it's important that the immigration judge is there, because the immigration judge went through this long trial, which included numerous pretrial hearings, which is also fairly unheard of in immigration law, and pretrial motions, pretrial briefs. Here's all this evidence and weighs it. And it's very difficult to weigh the evidence and to reconsider it in the immigration judge's case. In a case like this, because there is so much testimony, the immigration judge sees the witnesses. She got to see Ms. Noor and Ms. Muhammad over many, many days. Because of continuances, the government had to fly them back to Canada and bring them back here a number of times. The immigration judge saw them in different situations and weighed their testimony, and she found it more credible than Mr. Abdi's. And ultimately, this court shouldn't have to retry the case de novo. It shouldn't have to reweigh all the evidence. Doing so would essentially reduce this court to a trial court, and it's not. It's supposed to look at the evidence, see if it compels the conclusion one way or the other. Your time has about expired. Do you have anything you want to highlight in closing? Well, ultimately, Your Honor, I actually believe I just gave my summation, which is essentially that this court should not have to reweigh the evidence and reconsider it in the immigration judge's place. Thank you, counsel. Why don't you take it back down? Okay. So discussing the ONLF, the court has raised this, and we also agree with the court's concerns. I want to point out that Agent Morneau conceded that the government did not research the witnesses' background, did no investigation whatsoever to determine whether they were involved with the ONLF. That's significant. They have all the resources in the world to do so. The immigration judge, she basically, her view was it was irrelevant if they were members of the ONLF. She said they denied that they are, and this is repetitive, cumulative evidence, this video, and it's irrelevant to me whether or not they're members. And clearly, as this court has indicated, this is highly relevant. It goes to their motives for testifying in these proceedings, and it goes to their credibility generally. They're denying being involved in an organization that Mr. Abdi fears. And the video evidence, it was the immigration judge, while it's true that she admitted it, she gave it absolutely no weight whatsoever, and we believe that was reversible error because it's very probative as to these witnesses and as to their credibility. And we also submitted documentary evidence on top of the video evidence, and it's at pages 2,426 to 2,430. There's documentary evidence that describes the event that was seen on the YouTube video and makes very clear that this was an ONLF event. It was celebrating the 25th anniversary of the organization, and the leader of the ONLF was there. We also submitted a picture of the two witnesses with that individual. And so this is highly probative as to these witnesses' credibility, and the immigration judge gave it no weight at all. And the government conceded, even though the judge didn't admit the declaration of the daughter into the record, but in that declaration, she conceded she was there, and she gave some justification that, oh, we didn't know what the purpose of it was. We didn't get to cross-examine her, obviously. This was not developed. And we believe this is a significant factor in this case. And so, you know, at the very least, you know, because of that and because of all the other reasons that we've identified as to credibility, the court at the very least should remand and order the agency to analyze their testimony under the same standard that it, you know, applied to Mr. Abdi. Consider all of the factors. And just as one other point I wanted to just make, Judge Thomas, you talked about the cherry-picking isn't going to, you know, get us anywhere. But in Shretha, this court said that an immigration judge cannot cherry-pick one factor, you know, in support of a negative credibility finding to the exclusion of all others. And we believe that is exactly what the judge did in this case. Very good. Thank you. Thank you both for your arguments. It's a very interesting case, well presented, and it will be submitted for decision.
judges: Hawkins, Thomas, Nguyen